SMITH *versus* PETTUS, et al.

It is competent for Courts of Chancery to relieve a purchaser of real estate from payment of the purchase money, where the vendor cannot effect a title.

The inability of a vendor, through insolvency, to make titles to real estate sold by him, is a sufficient ground for the interposition of equity to prevent such vendor from enforcing the payment of the purchase money, until such disability is removed.

And where a note has been given by the vendee for the purchase money, equity will interpose against its recovery, even in the hands of an assignee, if the equitable defence would have availed against the payee.

The purchaser of real estate, has the right to discharge liens, and remove disabilities upon such estate, in order to obtain and perfect a title to himself.

This was a bill in Chancery, filed in Lawrence Circuit Court, to enjoin a judgment at law. The bill showed, that in 1819, the complainant purchased of William Pettus, a part of two lots of land, lying in the town of Courtland, in Lawrence county; that said Pettus, being indebted to the Commissioners of that town, for the said and other lots, it was agreed, that complainant should pay to them the sum of twenty three hundred and sixty-six dollars, and sixty-six cents, (the amount contracted to be paid.) A majority of the commissioners not being present to carry the arrangement into effect, the complainant executed to Pettus his notes for the said amount, payable in three instalments; that Pettus was to retain said notes until the Commissioners could meet, and in the meantime to execute a bond for titles; that subsequently, complainant received possession of the lots, and that Pettus' bond for titles, had been lost. The bill alleged that afterwards, complainant gave notice to Pettus of his readiness to complete the contract and to take up the notes of Pettus in the hands

of said Commissioners; but that Pettus insisted on being paid himself the amount of the first payment; that thereupon complainant applied to the Commissioners, and took up and credited Pettus's notes to the entire amount of his contract, of which Pettus had then notice; that Pettus, in violation of his agreement, assigned one of complainant's notes to one Anderson, who obtained a judgment at law on the same, against complainant; and that Pettus had left the State and was insolvent. To enjoin this judgment the bill was filed.

The answer of Anderson alleged, that he received the note in good faith, and without notice that any defence would be set up to its recovery, and relied on his judgment at law.

The Commissioners in their answer, admitted the insolvency of Pettus, and that complainant had taken up the notes of Pettus, as charged in the bill.

.The complainant afterwards filed a supplemental bill making William and Samuel Cruse defendants, charging that Pettus had assigned to them, another of his notes on which judgment had been obtained. The injunction thus prayed having been granted, the Cruses answered, and denied any knowledge of the judgment existing in their favor, or that they had any interest in it; insisting that they never purchased the note, and that their names had been used without their consent.

The evidence taken in the case, sustained the allegations of the bill; but on a final hearing it was dismissed for want of equity; and Anderson decreed the benefit of his judgment.

It was here assigned as error, that the bill was improperly dismissed.

*D. Smith,* for plaintiff—In this case it will be important to enquire, if the assignee has the same rights as the assignor.

If the note is tainted with fraud, the defence is good against the assignee. To support this position I cite 2 *Johns. C. R.* 443. The assignee of a chose in action, takes the note subject to the equity of the assignor.

The second reason against the recovery, is, that the complainant had the right to discharge the debt, and demand the title—and charge the amount to his obligation.—5 *Am. Dig.* 521. A vendor has a lien for purchase money against the purchaser, where there is notice that the terms of purchase are not complied with—*See* 7 *Cranch* 48, as to notice and purchaser.

In this case the party had full notice—*Welsh* vs. *Watkins,* 1 *Haywood's R.* 369.

5 *Littell's R.* 8.—In this case the relief granted was the same, as here contended for by us. There the relief sought was against the assignee.

As to the right of a purchaser of real estate to pay off claims or incumbrances against it, and charge his vendor with it, see *Sugden on Vendors* 347, 353.

It does not appear that there was any covenant against incumbrances in our case.

The party gets no benefit from his contract, and the insolvency of Pettus is the ground mainly relied on—1 *Ves. sen.* 88—5 *Am. Dig.* 101—5 *Cranch* 322 —6 *Har. & Johns.* 534. Equity will make that party immediately liable, who is remotely so at law.

The commissioners are parties in this cause, and the the prayer is to compel them to receive payment, and make title. Here the complainant is ultimately re-

sponsible, so equity should make him immediately so.—7 *Johns. Rep.* 358—4 *Mass. Rep.* 627. A distinction is taken on the point of extinguishing incumbrances, in *Johnson's Chancery Reports,* as to where the one having the incumbrance will never assert it : but that is not the case here. The incumbrance was not a dormant title, but a legal right. In fact it was not necessary for the parties even to resort to law.—17 *Mass. Rep.* 586.

Anderson was a purchaser with notice, and subject to the same equity with Pettus. They stand in the same condition.—1 *Munf.* 38. Notice binds, if received before conveyance is executed.

The complainant had no defence at law, as the notes fell due at different times, and there could have been no redress until all were paid. The Court will perceive, that there were a series of notes. Some were not due till after possession was obtained, by the complainant, of the land. It was different from *Christian* vs. *Scott*—1 *Stewart,* 490. There, there was benefit.—2 *Wheaton,* 13, is the same : but here the covenants are independent. The money was to be paid before the title was demandable —*Hayner* v. *Bank of Columbia,* in *Peters' Reports,* had as strong grounds of defence, as this case : but there it was held to be no defence at law.

See *Tennessee Reports,* 39—where the covenants were independent, and one party was insolvent—the other party was relieved from the effect of the independency of the covenant, on account of the other's insolvency.

In principle, there is no distinction between vendors coming into equity with bad title, where title has failed ; or when it certainly will fail—and yet insist-

ing for specific performance. It is unconsciencious to receive money, where there is certainly no title—1 *Tenn. Rep.* 258.

In our case it is clear Pettus had no title beneficial to us.—3 *Bibb's Rep.* 342—3 *Marsh.* 274, 469.

The principle is settled, that a vendee is not compelled to receive a bad title. Though good as for part, he is not bound to complete payment.

Any resort whatever to Pettus would be futile: his insolvency is absolute.—*Avery* vs. *Brownlee*—1 *Marshall*, 240.

An authority in 4 *Cranch*, 137, is especially relied on by us in this case, as it is strong; and very much in point—1 *Wheat.* 179, 195—5 *Munford*, 297, *note*—as to who must show the defect, or goodness of title. In 3 *Munford*, 68, will be found an authority, if it be said that party knew of the incumbrance. It is immaterial—he is still entitled to relief in equity. As to purchaser and defect of title, see 2 *Randolph,* 131, and 4 *Dessaussure's Rep.* 126.

As to relief against the purchase money in equity, and as to the extent of adverse title, see 2 *Johns. Ch. Rep.* 547, 548. If doubtful or dormant, no relief to purchaser in equity.

Here, there was no title except in the commissioners; and their title is a legal one, and one they can exert without the aid either of a Court of Law or Equity.

*Hutchison, contra.*—The argument of counsel, on the other side, has taken too wide a range. I call the attention of the Court to the bill. All authorities sustain the position, that there must be allegations in the bill to sustain the relief sought. The *gravamen*

of the bill, is the parol agreement as to the temporary arrangement. A title bond was afterwards to be given.

The bill seeks to throw Anderson in the shade. It contains no allegations to authorise any of the remedies sought, and embraced by the numerous authorities cited : authorities, good perhaps in themselves, but not embraced here. I will not reply in detail to the authorities cited, for they are inapplicable. What is truly in controversy in this cause? The main fact relied on was the parol agreement, and refusal to comply; and that Smith afterwards went and made himself responsible for the whole debt, to the commissioners. Anderson had no notice of it. What had Smith done previously? When sued, he sets up this parol agreement as a defence. The same facts were pleaded at law, as were afterwards relied on, in equity. See the special plea. Smith was fully apprised of all the facts now relied on in argu ment, for they are pleaded. In argument, Pettus' inability, insolvency, and absconding, are insisted upon.

This, sets up all the material parts of the former defence. The absconding occurred in 1822. Smith from the year 1819, to that time, making no effort whatever to obtain indemnity on account of Pettus' incompetency. Nothing done by Smith till sued: and even then he does not allege Pettus' inability It is not thought of—never averred as a ground of relief. We intended making the point, that the parol agreement could not be enforced at all, either at law or in equity—that it could never be set up except through the opposite party. We would have insisted on this position in reference to this case, but the

range taken in argument, and the authorities cited, dispenses with it, and induces us to rely on another feature of the case.

Pettus's inability is relied on, and they have assumed that Anderson stands in the shoes of Pettus, as regards Smith. They insist that the assignee is entitled to all the equity, &c. We need not attempt to controvert this principle, for it affords no aid for the reversal. The question recurs, whether if any equity did arise, it was ever asserted or sought to be enforced.

The parol agreement is the only equity charged in the bill. Smith became responsible of his own accord. What course should Smith have pursued? Pettus lived in the same county with Smith. Suppose Pettus entirely insolvent, or unable to procure a title from the Commissioners?—Smith should have filed his bill, setting forth that ground. Pettus, however, is suffered to remain a long time, then this bill is set up, and the same inability of Pettus is urged.

The ground assumed in argument is not sustained by the bill, or the record. The proper averments are not made. Improper grounds are taken by the bill, till Pettus absconds. Smith assumed to pay the amount due to the company, without ever consulting Anderson. He voluntarily assumed the full amount without giving any notice whatever.

A great variety of authorities are cited, but I feel satisfied they do not apply.

So far as the transaction existed between Smith and Pettus, the case might possibly be sustained; but it cannot be done, after the note passed for a valuable consideration to Anderson as assignee. The suit was pending by Anderson against Smith.

15

This was surely notice of the transfer of the note. Smith must have known of Pettus's inability, and he should have filed his bill against all, so as to have the matter determined so soon as known or discovered. Now after Smith, by futile defences, has delayed the case so long, until Pettus is gone, will the Court entertain his bill for relief? particularly when so long negligent of his rights, if he possessed any— and when his bill contains no averments to sustain it? And now especially to the injury of Anderson, an innocent assignee?

*Goldthwaite,* (same side)—What equity is apparent on the face of the bill? If there is no equity, there can be no decree.

The equity shewn must be from failure of consideration, partial or total, or an existing demand, as an offset. The equity must be for one of these causes: it can be for no other. The agreement in this case was to purchase "rights" of Pettus—there was no pretence of a sale of title. But Smith alleges a parol agreement besides. This presents two features of the case. The bill alleges the parol agreement to have been the contract. No parol agreement can vary a written contract. Smith relies on a parol contract, and cannot in any way have the benefit of it. It is not the same agreement—they differ, and the written one must prevail.—*Sugden on Vendors* 92. In a note in *Sugden,* the principle is sustained in many cases in England and America. Then if there was a written contract, as appears by his own shewing, how can the party vary it? What equity, then, does arise? Smith contracts not for the title, but for Pettus's right; and there is a great distinc-

tion in this. I admit that if land was sold, to which there is no title, it is different; but there the ground is a legal fraud, and a remedy is given. The ground must then arise either from failure of consideration, or from a valid off-set at the time of the transfer.

What are the rights an assignee acquires? and at what time do they attach? It never has been decided any where, that the rights against an assignee, are the same in all respects as against the assignor. Our statute extends only to cases where the off-sets exist before assignment. The party here cannot under the statute, or in any other way, go beyond the time of assignment: the right must attach and be fixed at the time of assignment. In this case the respective liabilities were fixed on the 20th of January 1820. What rights or off-sets had Smith at that time? Had he then suffered, or could he have suffered? Does he set out in the bill that he had any off-set or right against Pettus at that time? No. The payment was made to the Commissioners in October 1821—twenty-one months after the action was commenced by the assignee. We must see when the rights attached.

Suppose one buys a conveyance of a right, to accrue twenty years hence, and twenty annual notes be given; could payment ever be stopped, or negotiability be restrained, because at the end of twenty years the other party might fail? Is there any process of law or of equity that could restrain the negotiability of the notes? If a bill was filed in such a case, a Court of Chancery would say, you should have looked to this before. It is your contract—you stipulated for such a contingent right: How much stronger is the case, where there is an inno-

cent purchaser.    Whatever rights  pass  at the time of assignment, are fixed and  cannot be affected by any thing subsequently to happen.—9 *Johns. R.* 126. And this particularly, where it is the very thing the party has contracted for.    The case  I  cite  is very similar to the present one.    Here the complainant does not shew that he ever paid any thing to Pettus. There the Court said, the covenants are independent —that it is to be presumed that when the time rolls round the party  would  comply  with this contract ; that at all events they would say *caveat emptor.*  Why did he  not require  security?    Why  take his bond without additional security ?    The Court will say so because the party says so by his contract.

In 20 *Johns. R.* 15, there is a much stronger case than the one before us.    There the deed was to be executed on first  payment, and before the time, the party assigned the instrument, and  became entirely unable to comply.    There it was decided, that the covenants were independent.    When this case is investigated, it will be found that the party could not convey—he had previously conveyed.    It was apparent the title was gone.    But the ground of decision was, that the time had not rolled  round, and it did not appear, nor could it appear, but that at the expiration of the time limited  by  the contract, the party might get a title.

Here Smith could not say when the assignment was made ; that at the expiration of the time  Pettus would not comply.    Can a bill be filed, alleging that three or four years hence a contract will not be complied with ?    A Court of Equity cannot make a new contract for a party—if he has made a bad contract, he must abide by it.    If the ground then insisted on .

here is the insolvency, it fails: it is merely a contract to perform an act in future. All the authorities on the other side rest on covenants against incumbrances. Could I not contract to pay one thousand dollars in stock at a future day? If I had no stock at this time, would the party be authorised to fly off, and demand security of me, when he never thought of it at the time of contracting? Are we restricted to contract only for what we absolutely own?

Here Smith agrees to risk Pettus for three years; and the question is, what off-set had he when the note was assigned, or what discount, or failure was there then? Nothing was then in existence to defeat the note, and it was payable before the other party was to be called upon to perform: therefore it could not fail, and Smith had agreed he would pay before he knew whether Pettus would fail or not. Suppose, as Anderson says, that after the transfer to him, he went and demanded payment? Was any defence set up—could any be set up? Was any payment then made? If payment to the Commissioners had been made, under the contract with Pettus, before the assignment to Anderson, it would have been good; but if that payment was made after notice of the assignment, it was made of the party's own wrong, and he cannot now avail himself of it. Besides, that point would have been pleadable at law, and would have been good there. We see that the case was litigated at law, and a judgment rendered against the complainant. So if the ground of defence is payment, was it not a good defence at law? If there had been any contract between Smith and Pettus, that Smith should pay to the Commissioners, and he had so paid—Smith having no notice of the

assignment—the defence would have been good. But the judgment at law concludes this matter. After delaying two years, Smith applies to chancery, and alleges his contract with Pettus. Why did he not inform Anderson, so that he might procure redress from Pettus? He who seeks equity must do equity; and if Smith has lost his recourse, he must suffer— for it was through his fault and neglect.

As to insolvency, it is not pretended that Pettus became insolvent before 1822—the contract was to be performed in 1819 or 1820. If Smith had complied in time, how could he have known of a failure? How could Anderson, while he held the note, take redress against Pettus? How can there be an off-set urged which is to happen after the time when, by his contract, a party is to pay? Smith, when he took the bond for title, knew there was an outstanding title. He took the bond payable at a future time, and relied on it for his title. If he doubted Pettus, why did he not require surety? He cannot now apply to chancery, and say he was mistaken as to Pettus's insolvency. Suppose Smith had heard that Pettus intended to transfer the note, could he have prevented him, and restrained its negotiability?

Whatever equity exists in the bill is destroyed by the answer. The same defence now relied on, was insisted on in the Court of Law; and the complainant, after trying law, now seeks equity, and that, after he has been the means of destroying Anderson's rights. Where a party has made or could have made his defence at law, no relief can be obtained in equity. A Court of Chancery cannot revise an error at law: the writ of error at law was the remedy.

The case in 2 *Johns. C. R.* 443, with one limita-

tion, is good; but our statute limits the defence to sets-off existing at the time of the transfer.

The complainant contends, that he could remove incumbrances. The authorities do not sustain the position—they sustain it only where a covenant *in præsenti* is made against incumbrances, but not as to future incumbrances. A covenant against future incumbrances, gives no present action of covenant, nor any right to buy them, till the the time elapses. The case in 7 *Cranch* 48, does not deny this—it is merely *dicta*, and does not apply to the point in question.

We admit that Smith had full notice of outstanding title, but it is immaterial, and the knowledge is the worse for him—he should have guarded by surety.

The case from *Haywood* 367, is contrary to the law as now received. But I deny the right to go so far as there contended for. Admit, however, the case to be good law—it was a case of gross fraud, an attempt to sell that which had no existence; and the fact that the notes were not not negotiable, makes it a different case. In point of turpitude there is no similarity; and another defence here raised, was not there—the right to defend at law. There was no decision in the case cited on that point, or the result would have been different.

The case from *Littell* 8, does not resemble ours. We have none of the facts on which it was decided.

The principle contended for in *Sugden* 347, does not support the other side, but it shows a position for us. The incumbrance was known to Smith—it was contingent and known to be so—yet he chose his own remedy against the contingency.

The case from *Vesey*, *sen.* has no application. The principle that a Court of Equity will not compel specific performance, where the title is doubtful, is admitted ; but if the party had notice of defects, he can ask no relief.

The cases from 4 and 17 *Mass. R.* and from 7 *Johns.* R. 358, were actions of covenant on clauses in the deed, to secure against incumbrances, and all in *præsenti*, not in *futuro.* But suppose the covenant had been to convey at a future period, would the action have been sustainable in *præsenti ?* To be sure not. A covenant to do a thing at a future day, does not operate till that day arrives.

Another point insisted on was, that the party had no defence at law, because the note sued on was one of a series. Admit this----he had none in equity either---he cannot change his contract. Could he pray a delay of twenty years from the first note due, till the last, because the party might be then insolvent?

In the case cited from 1 *Tenn.* R. 39, the decree was that an account should be taken, and that the insolvent party should have the benefit of his contract. The Court there refuses to make law for the parties. Here if the suit was by Pettus, the right to off-set would be good at law, and might be asserted in equity if insolvency accrued, no third party being concerned. The case from page 258, is not relevant----it is between the parties themselves, and was a case of abominable fraud. Here there is no fraud pretended.

So in 3 *Bibb* 342, the case was between the original parties. It was not the same question. The question would have been, if assigned, was the off-

set existing at the time of the transfer ? This is the grand distinction governing the cases.

The case in 3 *Munford* is good law; but there is a marked distinction as to the case here presented. There, there was an actual existing covenant against incumbrances at the time. Again, there the assignee had notice, and there was no [or very trifling] consideration given.

The case in 2 *Johns. C. R.* 547 and 548, was under particular circumstances, and as admitted was an exception to the general rule.

Here Smith has never been disturbed from his possession, and for aught that appears, Pettus may become, or may now be able to make the title.

The right of Smith at law is gone, and he has no paramount equity to ours.

The case in *Freeman's Reports* sustains a principle for us. We say there is no fraud alleged here.

*Ormond*, in conclusion—The counsels' whole argument is founded on a wrong foundation. They consider this paper negotiable. Since our statute of 1812, there is no negotiable paper, except, perhaps, cotton receipts.

It is insisted that a party must have a good defence at the time of the assignment. I think that by a reference to the statute, it will be found otherwise. In England, when a bond is assigned, (or assigned at Common Law,) and equity is called upon to give it effect, they say the assignee takes it subject to all equitation. Our statute is precisely to that effect. It is different in England, by commercial rules, as to negotiable paper ; but our statute re-enacts the Common Law, and we must take the statute for what

16

it is.—2 *Wash. R.* 298. There the Court say, it is a common law rule, the statute being silent, and equity will do what it should do, independent of the trammels of commercial rules. Here our paper stands by the statute, as a bond at Common Law, as to the rights of the assignee. This destroys the whole of the position taken by the other side.

All equity is to grow out of the contract, although the contingency afterwards arises. The equity is inherent in the contract, at the time it is made. All equity must spring from the foundation of the transaction, and ours derives its origin from the time of making the contract. I can imagine no case where the equity of a case does not derive its source from its origin. It is an implied condition, and attaches afterwards when the circumstances transpire. Suppose the case of a mortgage of land—what is the situation of the parties? One has a legal title, and one the equity of redemption. Suppose the mortgaged assigned—the assignee takes it subject to the equity of redemption. It must happen afterwards: it is burthened with the germ of that equity which might or might not arise.—2 *Johnson's C. R.* 443.

It has been said that Smith's conduct is reprehensible. It is in proof that Anderson was apprised in February, 1820, of all the facts and circumstances now insisted on. Then Anderson had a right of redress against Pettus: so it would apply, to say, that he lost by delay of Smith. Anderson could have demanded payment of Smith, and then sued Pettus: he could have collected the amount, because Pettus was then solvent. He had then a remedy which we had not. The answer shews that he could have then recovered of Pettus—and how can he then complain of neglect and delay in us?

The case of Stockton *vs.* Cook, 3 *Munford*, is directly in point—Cook there occupies precisely the position that Anderson does here. Our knowledge, that Pettus had no title, is immaterial; we had his obligation for title—it was that we bought. We say we had no defence at law; we acquired the notes from the Commissioners too late to avail us as a setoff. We all agree that the parol agreement was void, but it had a bearing to shew that Pettus had a fraudulent intent. But suppose it was void, can a defence predicated on it bar a remedy in a proper forum?

The proof shews, that soon after Pettus left the country, his agent annulled the contract · with the Commissioners, and thus our case is in point. It is the same to annul the contract, as to convey to some one else.

Pettus has not a power now to perfect a title—his bond is cancelled.

Smith purchased the land in order to make valuable improvements. What was he to do! The Commissioners would never have given a title until they were paid; for they had the fee. Our case. is much stronger, than a case where a title was outstanding, doubtful and uncertain.

The bill is properly drawn; it shews enough and prays relief. Under this alone we are entitled to all the relief the facts warrant.

Suppose the notes not yet procured from the Commisioners : this could not vary the case. If the party wished a title, the Court would compel him to pay, before he could get one. Then he is in no worse situation than if he had not paid at all.

If it is true, that the assignor and assignee stand in the same relation, it is important to consider how

Pettus would stand.    Stand how he will, Anderson
must stand or fall with him.

PERRY, J.—The complainant in this suit, and who
is plaintiff in error, filed his bill in the Circuit Court
of Lawrence county, in which he alleges that on the
—— day of ——, 1819, he purchased of the defend-
ant, Pettus, lots Nos. 87 & 88, in the town of Court-
land, for which he agreed to give two thousand
three hundred and sixty-six dollars and sixty-six
cents, which sum he was to pay to the Commission-
ers, the said Pettus being indebted to them for said
lots.  The Commissioners not being present, the ar-
rangement could not then be made, and the com-
plainant executed his notes payable to Pettus in three
instalments.    The first for seven hundred dollars,
payable the 25th of December, 1819 ; the second for
eight hundred and fifty-three dollars and thirty-three
cents, payable the first of November, 1820 ; and the
third for eight hundred and thirty-three dollars and
thirty-three cents, payable the first of November,
1821—which notes Pettus was to hold until the
Commissioners could be got together, and the com-
plainant substituted in the place of Pettus as their
debtor for the lots, and receive a title immediately
from them.   Said Pettus executed his bond to com-
plainant to make title to said lots, which was to be
cancelled when the arrangement should take place
with the Commissioners, and their bond substituted
for Pettus's, which bond of Pettus is lost or mislaid.
The complainant received possession of said lots in
December, 1819, at which time he gave Pettus notice
that he was ready to take up his [Pettus's] notes
executed to the Commissioners for the purchase mo-

ney of said lots, amounting to two thousand three hundred and sixty-six dollars and sixty-six cents, and to receive a bond from the Commissioners to make him a title, and to give up to him, Pettus, his bond for title.    Pettus refused, and complainant refused to pay the notes, and on the 13th day of October, 1821, he applied to the Commissioners and lifted two of Pettus's bonds for one thousand and thirty dollars each, dated the 29th of October, 1818, and payable in one year, and the other, two years after date, and procured for Pettus a credit for three hun- and sixty-six dollars and sixty-six cents on another note held by the Commissioners against him, making the full amount agreed to be given by complainant for said lots, and also the full amount due by Pettus to the commissioners for said lots; that he, complainant, has made valuable improvements upon said lots: that Pettus has assigned to C. Anderson, one of the defend- ants, the note for seven hundred dollars, and that a judg-. ment at law has been obtained thereon.    The com- plainant prays an injunction of the judgment at law, and that the notes be cancelled and makes the pro- per parties defendants.    Complainant also exhibits the notes executed by said Pettus and John P. Brod- nax to William H. Whitaker and others, Commission- ers of the town of Courtland, to secure the purchase money of said lots, also the receipt of the Commis- sioners for three hundred and six dollars and sixty- six cents, paid as before stated.    The defendant, Charles Anderson, answers, that he took the note from Pettus for money which he had previously loan- ed to him, and without notice that there would be any objection to the payment of it; that he knew nothing of the parol agreement, and does not admit

that any such was made; but admits that the written agreement stated in the bill of complainant was correctly made, and that the same is correctly stated in the bill. The defendant does not admit that complainant in December 1819, proposed to Pettus to substitute himself to the Commissioners as the payor for said lots, and receive their bond for title and to give up Pettus his bond for title, and that Pettus refused. The answer admits. that complainant has taken up Pettus's notes to the Commissioners, and obtained a credit for him, as stated in complainant's bill. The answer also denies the insolvency of Pettus at the time the note assigned him fell due, and up to the time Pettus and his security left the country, which was in January 1822: the answer admits that Pettus was involved, but that he paid all executions up to the time of his removal. The answer then avers that Pettus, at the time of the sale of said lots to complainant, and afterwards, and until he left this country, was the owner of stock in the Courtland Company to a considerable amount. The record of the proceedings in the Court of law shows, that the note was executed on the 17th day of July, 1819, for seven hundred dollars, payable to Pettus on the first day of November thereafter, as the first payment for lots, numbers eighty-seven and eighty-eight, in the town of Courtland, and that the said Pettus on the 29th day of January 1820, assigned the same to Anderson. The other defendants, William H. Whitaker, James Perrine, John Allen, Thomas E. Tart, and Bernard McKernan, the Commissioners of the town of Courtland, in their joint answer, state, they know nothing of the contract between complainant and Pettus; but they admit that Pettus was the purcha-

ser of said lots Nos. 87 and 88, as stated in complainant's bill. They also admit that said Pettus has absconed from this State, and left the United States, leaving many large debts unpaid, among others said debts to the respondents for said lots. They also admit that said Pettus, and his security Brodnax for the payment of the purchase money of said lots, are insolvent. They also admit that complainant has taken up said notes of Pettus and Brodnax, and executed his notes in lieu thereof, as charged in complainant's bill. They further state that since Pettus absconded, Daniel Wright, Esq. his agent, settled with the respondents for the purchase of all the property purchased by said Pettus of the respondents in said town except said lots Nos. 87 and 88, and gave up the bond of the respondents to make to Pettus the title to the lots purchased as aforesaid, including lots Nos. 87 and 88, and exhibits the bond as a part of their answer, by which it appears that they bound themselves to make to Pettus a title in fee simple as soon as the purchase money should be paid, the last instalment of which fell due 29th October, 1821.

The complainant subsequently obtained leave and filed his supplemental bill, making William and Samuel Cruse, defendants, charging that Pettus had assigned to them one of the notes for eight hundred and thirty-three dollars and thirty-three cents, and that they had obtained a judgment at law thereon, and prayed an injunction, which was granted. The defendants, Cruses, answer and deny that they have any knowledge of the transaction. They also deny having any interest in the judgment; that they never purchased the note, and that the first intimation that they ever had of any such proceedings being in exis-

tence was, when the complainant's bill and supplement were served upon them, and that their names had been used without their consent, privity or connivance. The depositions taken in the cause prove substantially the allegations charged in the complainant's bill. On the hearing in the Court below, the bill was dismissed for the want of equity and Anderson decreed to have the benefit of his judgment at law. It is now assigned for error that the bill was improperly dismissed, which brings to the consideration of this Court the right of the complainant to the relief sought; or how far a Court of Chancery will relieve the purchaser of real estate from the payment of the purchase money, when from subsequent events the vendor becomes unable to make titles, and also the equity between the assignee of the vendor who has become unable to make titles, and the purchaser, in being relieved from the payment of a note given for the purchase money : and thirdly—how far the purchaser of real estate has a right to discharge liens upon the property, in order to obtain titles.

In considering the first proposition, the equity of the bill is involved; for if a Court of Chancery is incompetent to relieve a purchaser from the payment of money agreed to be given for land, when the vendor is unable to make titles, there is no equity in the bill, and it was properly dismissed. That Courts of Chancery will exercise jurisdiction in perfecting titles to real estate, or in case that can not be done, to relieve the purchaser from the payment of the purchase money, is abundantly established by authority.

The Supreme Court of Kentucky, in the case of a3Bibb,342 *Fishback* vs. *Williams*,[a] decided, that if a vendor is unable to convey, it is unconscious in him to enforce

the payment of the purchase money until he is able to convey ; and that such an inability is good ground for the vendee to apply to a Court of Chancery to enjoin the vendor from enforcing payment. The same principle is recognised in *McKinney* vs. *Watts, et al;*[b] and in page 470 of the same Book, *Hamble's heirs* v. *Hawkson's heirs,* it is decided, that the purchaser of lands who receives a bond from the vendor to make title, he having no title, may resort, after a great lapse of time, either to Law for compensation, or to Equity for a dissolution of the contract ; the jurisdiction is concurrent.

[b] 3 Marshall, 274.

In *Marshall,* 240, (*Abney* vs. *Brownlee's adm'r,*) the Court held, that the insolvency of the purchaser was sufficient to protect the seller from his covenant to convey, and lay down the rule that a total inability to comply by the one, operated as a release of the other; and there is such a uniformity of decision in all the Books, that I deem it unnecessary to pursue them further.

That Pettus was insolvent, and unable to make titles to Smith when the bill was filed, and has ever since continued so, is a fact incontestibly established. It is also true, that by the terms of the agreement between Smith and Pettus, Pettus was not bound to convey until the purchase money was paid ; if therefore he had been possessed of the title, his withholding a conveyance would have been no excuse for a suspension of the payment by Smith. But Pettus being insolvent—having no title—he was unable to perform the agreement on his part ; he could, therefore, have no right in equity and good conscience, to insist upon the performance upon the part of Smith: his inability to convey was, therefore, a sufficient

ground for the interposition of a Court of Equity, to prevent him from enforcing the payment of the purchase money until his inability shall be removed.— So far then, as Smith's and Pettus' rights were concerned, neither the rules of law or of equity impose any obstacle in a Court of Chancery adjusting them.

I will, in the next place, consider if the transfer of the note to Anderson, given by Smith to Pettus, for the first instalment for said lots, placed Anderson in a better condition than Pettus, as regarded the equity of Smith. The ability with which this point has been argued by the counsel, for and against the defendants, has induced me to examine the question with some minuteness; and I will in the first place remark, that the defendants counsel rested his defence, with much force, upon the defendant, Anderson, being the holder of the note, which was negotiable, and that for a valuable consideration, and before the equity of Smith arose. If the proposition, out of which the argument arose, be true, that the note from Smith to Pettus, was a negotiable instrument, then Smith's equity, which arose after the paper was negotiated, would be postponed to that of Anderson, who had acquired the interest in it.

I presume it will be admitted, that the note out of which this controversy arose, so far as Anderson is concerned, is not by the Law Merchant, a negotiable paper. Have we any statute then, or legislative provision which makes it negotiable. It will be found in the *Digest*, page 67, that the Mississippi Territory, in 1807, passed an act, in the first section of which it will be found that promissory notes were made negotiable as inland bills of exchange, were, by the custom of merchants in England. By this statute, promissory notes remained negotiable until

SMITH *vs.* PETTUS, et al.

1812, when the Legislature again legislated upon the subject. By the first section of that act,[a] it will be found, promissory notes with other instruments for the payment of money or any other thing, should thereafter be assigned by endorsement, and gives the assignee a right of action in his own name, and the payor the benefit of all payments, discounts and setsoff, had or possessed against the same, previous to notice of the assignment. In the second section of this act, it will be found that the Legislature repealed the law making promissory notes negotiable, placing them again in the same situation as they were at Common Law, with the exception that they might be endorsed, and the assignee sue in his own name, and giving the payor the defences, mentioned in the statute. Promissory notes, therefore, have no negotiable character given to them by statute. Anderson then can not be the innocent holder of a negotiable instrument, and therefore stands in the same situation as Pettus with respect to the note, and all equitable defences that Smith might have set up against him. This was declared to be the rule of decision, by one of the ablest American jurists of his day, (Judge *Haywood,*) in the case of *Welch* vs. *Watkins & Picket.*[b]) In the case referred to, Watkins sold land to Welch, gave bond to make a title, and Welch executed a note to deliver a good waggon and team by such a day. Watkins endorsed the note to Picket, and after the endorsement it was discovered that Watkins had no title to the land. Judgment was obtained upon the note, and an injunction awarded to stay the judgment at law.

In the case referred to, (as also the one under consideration,) the note was given for land to which

[a] Aik. Dig. 328

[b] 1 Hayw. Rep. 369.

the vendor could not make title. The learned Judge says, " he cannot, therefore, in equity, demand payment of the money, and is not entitled to a recovery of it." The same principle is laid down in the case of *Norton* vs. *Ross*,[a] in which the negotiability of the instrument, the payment of which was sought to be enforced, was the point upon which the case turned, and involved the construction of the statute of Virginia which makes bonds &c. assignable, which is in its provisions similar to our own of 1812. The Court decided that it was not intended by the statute to abridge the rights of the obligor, or to enlarge those of the assignee, beyond that of suing in his own name. Whether or not the construction given to the statute by the Courts of Virginia be the correct one, is by the 2d section of our statute, rendered unnnecessary to enquire into, inasmuch as it has declared, that promissory notes are not negotiable; the character of the instrument being fixed, ascertained the rights of the parties. It not being negotiable, the assignee took it subject to all the equity of the obligor against the obligee, although he may be the endorser for a valuable consideration and without notice.

The case of *Stockton* vs. *Cook*,[b] is further illustrative of the principles above decided. The Court, in the case here referred to, places the assignee of the bond in the same situation as the assignor, as regards the equity of the payee, and that the payor is not precluded from relief in equity against his bond for the purchase money, by the circumstance that before he made the purchase he was fully apprised of incumbrances, and took the bond of the vendor to free the estate of them. This authority

[a] 2 Wash. Rep. 298.

[b] 3 Munf. R. 68.

furnishes an answer to the argument used by defendant's counsel, that Smith should resort to his covenant against Pettus for redress. How futile would such a suit have been against an insolvent man, even were he within the jurisdiction of our Courts. That insolvency is a substantial ground for relief in equity, I refer to the case of *Hamlin's exr's.* vs. *Berry.*[a] [a] Tenn. R. The case referred to, was one of mutual and inde- 39. pendent covenants, and Judge *White,* (for whose opinion I have the highest respect,) decided that that could have no bearing on the case. The case of *Greenby* vs. *Cheevers,*[b] relied on by the defendant's [b] 9 Johns. counsel, contains no principle adverse to the relief Rep. 126. sought by the complainant in this suit, or contrary to the authority above referred to. The case in *Johnson* was an action to recover back money paid for land, because of an existing incumbrance. The Court decided that before the plaintiff could recover, he must fix a default upon the defendant. I consider this case, then, as an authority on the side of the plaintiff. Pettus is surely in default, and will ever remain so, as far as I am enabled to judge from the testimony. He should not, therefore, derive any benefit from a contract, which he has placed out of his power to fulfil. That he has done this is abundantly proved : for his agent cancelled the agreement between him and the commissioners, and gave up their bond by which they were bound to make him titles to the lots when the purchase money was paid. If he could now force Smith to pay for the lots because their agreement was independent, I should conclude that there was nothing substantial in the name of justice.

The case relied on by the defendants in 20 *Johns.*

*R.* 15, I have not had an opportunity of examining; but so far as I recollect the principle of decision in that case, it is this, that he who has the prior equity shall be preferred, recognising the principle in its fullest extent : if it be true, that the assignee stands in no better situation than the assignor, Smith's equity is prior to Anderson's, because Anderson's equity depends upon Pettus', and he has none by reason of his inability to perform his contract. So far then as the rights of Smith and Pettus, or Pettus' assignees, are concerned, I might here close the investigation of this cause; but the complainant seeks in his bill to have a conveyance of the lots from the commissioners of the town of Courtland, to him, upon his paying the price agreed to be given for them by Pettus, it being the same amount agreed by him to be paid to Pettus for said lots. Smith's right to remove an incumbrance in the way of a complete title, which Pettus had covenanted to make, is well sustained upon principle, and to have the amount thus paid, deducted from the price agreed to be given, is [a]4 Mass.R. 627. sustained by the case of *Prescott* vs. *Truman*,[a] also [b]17 ib. 568. the case of *Sprague* vs. *Baker*:[b] his right to do this is in accordance with strict justice; for otherwise he might never be able to obtain a good title. But how far the recission of the contract between Pettus and the commissioners, by which they received back the lots, and became again invested with a complete title, to them, affects Smith's right to have a conveyance from them on payment of the purchase money, has not been made a question, and I presume will be unnecessary to a decision of this cause, in as much as the commissioners have received Smith's notes for the purchase money and set up no resistance to the con-

veyance provided the money is paid ; it would be un-
necessary therefore to use argument or authority to
compel persons to do that which they are already
willing to perform.    I am therefore of opinion that
the decree of the Court below be reversed—and in
this opinion the Court is unanimous.  And this Court
proceeding to render such decree as' the Court be-
low should have done.    It is therefore ordered, ad-
judged and decreed, that the decree of the Circuit
Court be reversed.    It is also further ordered, that
the  injunction of Anderson's judgment be made per-
petual, as also the judgment in favor of Cruses.—
The note of Smith to Pettus, outstanding, is hereby
cancelled, and declared to be void.  That the com-
missioners of the town of Courtland make to Smith
a good and sufficient title to said lots upon Smith's
paying to them the purchase money.    That Smith
and Anderson pay jointly the costs of this suit.